Good morning, Your Honors. May it please the Court, my name is Henry Posada, and I represent the petitioner in these proceedings. Your Honors, this is a case involving a political refugee from Cuba who came to this country seeking refuge in 2001. The petitioner makes two major arguments in this case. Number one, that he is and was eligible for asylum, withholding and convention against torture, as well as adjustment of status under the Cuban Adjustment Act. His asylum case was denied for two reasons. One was credibility. The other was firm resettlement. Both of those bases should be overturned by this Court for the reasons that I've raised. You never said anything about the firm resettlement question in your briefs, did you? We addressed it before the BAN. To address the exhaustion claim of firm resettlement, Your Honor, I'll begin by noting that we have a very bad record in this case. There's a lot of circumstances in this case that cause that to be the case. The representation in the proceedings below was not the best that it could have been. Nevertheless, the law in this circuit, I believe, is that an issue can be sufficiently raised in the notice of appeal if the And when you look at the notice of appeal in this case, Your Honor, at page 142 of the record, counsel writes, The evidence of record is substantial to warrant a grant of asylum. The I.J. erred in rejecting Respondent's application for asylum. Now, the words firm resettlement don't appear on the notice, but firm resettlement is an aspect of asylum. It is one of the bars to asylum. Was there a brief filed as well? There was a brief filed. And it didn't mention firm resettlement. It did not mention the words firm resettlement. It did not. It's kind of a shame because it's probably the best argument, but it doesn't look like it happened. Well, Your Honor, this is an asylum case. In light of the circumstances, we really urge the Court to be charitable in its interpretation of the exhaustion issues in this case. We think that there is sufficient notice to the BIA, considering the firm resettlement issues in this case, that the BIA could have corrected the immigration judge's errors. Did the BIA file the agency file a response to this brief? I mean, did they raise the brief before the BIA? Was there a responsive brief filed? There was a brief filed. Did it mention firm resettlement? It did not mention firm resettlement. It was basically an adoption of the well-reasoned opinion of the immigration judge, which would have incorporated, by reference, the well-reasoned decision, so to speak, the putative well-reasoned decision of firm resettlement, which would have been included. There was sufficient notice under the circumstances of this case. We really need to push for lenity on this issue and for a charitable interpretation. Clearly, firm resettlement is not a separate remedy in and of itself that should have been raised, but it's a part of the asylum analysis. And it even went to the issue of credibility in this case, because the judge referred to it in passing on one or two occasions that, well, you didn't come to this country because you feared persecution. In fact, you lived in Mexico. It kind of tied into the credibility analysis. To address the merits, then, of the firm resettlement question, this was an FM-3 visa. The petitioner testified that it was an FM-3 document. This Court in Campo Seco v. Ashcroft has held or has observed that an FM-3, as well, is not a document that constitutes an offer of permanent residence. It is simply a renewable, nonimmigrant visa that appears to allow some sort of living and work privileges. The very existence of an FM-2 visa, which does allow the holder of the visa to apply for some sort of permanent residence, reflects that the FM-3 clearly is not. So the existence of the other one negates the possibility of legalizing permanent residence status under an FM-3 visa. Turning, then, to the question of credibility, Your Honors, this is a shameful display on the part of the immigration judge. This Court has consistently held that credibility determinations have to be based on substantial evidence. There has to be specific cogent reasons for the adverse findings. In this case, the judge found that the petitioner was not credible because of inconsistent statements that he made or statements that he made during his initial encounters at the port of entry. One was made on the day of arrival. Another one was made 13 days later when a credible fear interview was made. Basically, the petitioner stated he was afraid of going back to Cuba but did not state that he had been beaten and tortured. He did not state these things at the initial interviews. I would like to go to the credibility issue. Yes. There is a record that's missing. The judge used the initial Q&A, which the judge cites as Exhibit 9, at page 180, 181 of the record. Exhibit 9 is not in the record. So we don't know exactly what the petitioner said in those statements. Yet the court, the I.J., used them to impeach the credibility of Mr. Perez. Moreover, with respect to the credible fear interview, the judge speculated that after 13 days, the petitioner would have had the ability to reflect, the ability to think about what his statements are, what his claim is, and then tell the rest of the details of his claim. It's a little odd because the petitioner was in custody, unrepresented, housed with other criminals. That's why they have these interviews. I mean, they don't they're there's a purpose to them. It's not, you know, just a pointless exercise. They have a credible fear interview to find out what the story is. And I'm at a loss as to understand why it's shameful for the I.J. to look at what was said and find an absence of a claim of harm. And then when he tells a different story, comment on the contradiction. Yes, Your Honor. Thank you. Maybe shameful is an overstatement. Wrong. Error. Illogical. It was an error. Why? Well, because the petitioner in this case, at that point in time, was in custody. He had been detained for 13 days. He was unrepresented. It doesn't count. I mean, he doesn't know if he's going to be returned to Cuba, where it's against the law to have applied for asylum. He doesn't know that the asylum law It's against the law to come to the United States to begin with, I assume. Sorry? I assume, and he says it, and perhaps his best argument is that it's against the law to come to the United States at all. It's against the law. It's against to have any relations with the United States if you're in Cuba. It doesn't really matter whether he claimed asylum or didn't claim asylum when he got here. He was already here. He also doesn't know, Your Honor, that we have confidentiality rules with respect to asylum. Yeah, but he said he's afraid to go back, so it's not like he said it's paradise there. He said, they didn't hurt me while I was there, but I'm afraid what's going to happen to go back. I don't understand why the IJ can't say, well, you've told a different story now here in court. Well, he explained it. He gave him an opportunity to explain. He explained that he was nervous, that he would refuse. Okay. He told a story, and the IJ didn't buy it. I mean, he doesn't have to believe everything every witness says. Right. But I think this Court has stated in prior cases that there's hesitation to use these early statements of aliens when they first come to the country to impeach subsequent testimony. Well, I have a real problem right now in this case, because we don't have the record. So I don't see how we can unless we see the record, I don't know how we can do that. I don't know in what form it was communicated and recorded. And we do have cases that talk about the – there are circumstances in which you have to have the actual official testify, depending on whether the questions were written down, depending whether it was under penalty of perjury and so on. And we don't have the piece of paper. So at this point, I don't see how we could affirm it. But at some point, presumably, it's going to show up at least. And when it does, we'll be more than happy to address that case if it does, in fact, get remanded for that reason. And I will say that it is a poor record. The Q&A, one of the documents that the judge used to find that the petitioner was not credible, which the IJ included as Exhibit 9, is just simply not in the record. It has never been in the record. I've never seen it in this record. When the IJ said to him, you told a different story at the Credible Fear interview, what did the petitioner respond? Petitioner said he was nervous and that he wasn't thinking straight. He said, I'm confused. So he didn't deny saying it. He didn't deny saying it. That is correct. Well, at one point he did. Twice he said he did, and then at one point he said he didn't. Right. And that's when he said, Your Honor, that I'm just confused at that point. Because the immigration judge had been somewhat, I won't say abusive, but there is the incident to move on to the next issue of credibility. There is the incident of the burn scar, which the immigration judge simply, you know, ordered the petitioner to come up, ordered him to lift up his shirt. Well, but first he said, no, I have no scar. And then he said, yes, I do have a scar. Well, he said it's been a long time. He thought, well, maybe you can't see it. So he went up and he showed him the scar. And the immigration judge, again, used speculation and objection. Are you going to get at some point to the Cuban refugee? Yes. Yes, I will do that now. The Cuban Adjustment Act, Your Honors, was enacted in 1966. It's remedial legislation to address the large influx of Cuban refugees dating back from 1959 when Batista was overthrown, when Fidel Castro took over. There was a large influx of Cubans. And the Cuban Adjustment Act was created for the sole purpose of resettling Cuban refugees. Our position is that Cubans that come within the class of protected persons under the Cuban Adjustment Act are refugees. That was always the intention of Congress when it wrote this legislation. I'm sorry. Well, this is a bit of a return to what we were talking about in the last case. But the BIA itself hasn't responded to this, to your argument that essentially there should be an exception for this one kind of an invisibility as there are for some others. Is that right? I need to address that point, Your Honor, because, again, we come up with an exhaustion issue. And this was definitely exhausted, Your Honor. I wasn't – I assumed it was. Right. The BIA didn't – well, we don't know what the BIA did because it – this is an affirmance without opinion. And so – but you look at the brief of counsel and brief – the counsel's brief, the Cuban Adjustment Act is a creation of Congress to benefit nationals of Cuba who flee the country because of communist environment the government creates. Adjustment of status under the Cuban Adjustment Act is somewhat different from the normal family-based adjustment of status. The Cuban Adjustment is a special type of relief. And can I interrupt you for just a second, counsel, because I'm trying to get my head around this. So there are certain waivers of inadmissibility that are available to other types of refugees, correct? Correct. And then there's the CAA, the Cuban Adjustment Act. Isn't the Cuban Adjustment Act sort of a subcategory of other refugees such that – I guess the question is why wouldn't those other avenues of waiver of inadmissibility also be available to those who are subject to the Cuban Adjustment Act, right? That is the question. That's the point. And that has not been answered by the BIA in any way. No, it has not. The BIA – I mean, the other oddity here is that this statute has not been applied literally by the agency. The BIA has created some exceptions. The agency itself and its handbooks has exceptions. Right. So it hasn't been applied literally. No. The BIA has not issued any form of published decisions, but every indication from the BIA matter of Artigas, there was a commissioner decision matter of Mesa where the public charge of inadmissibility doesn't apply to Cubans under the Cuban Adjustment Act. The former section of the CFR with jurisdiction in arriving aliens doesn't apply to aliens under the Cuban Adjustment Act. Every indication seems to be that the statute, insofar as it is remedial in nature and humanitarian, has to be taken under a special lens to make sure that the humanitarian purpose is fulfilled. Now, under 207B of the Immigration and Nationality Act, the attorney general can admit a refugee who's not firmly resettled, who is determined to be of special humanitarian concern to the United States, and it goes on. And then it sets forth the waivers for the refugees, which includes false claim to citizenship. The language is determined of special humanitarian concern, throws us back to the 1966 legislation of the Cuban Adjustment Act. Now, this kind of lying at the border, I gather, would not preclude an ordinary asylum claim. Absolutely not. It is a discretionary decision. At the end of the day, the courts have held, the court has held, that many refugees arrive in the United States in irregular manners. They commit fraud. It's unfortunate. It should not be condoned. But that is not the sole reason for adverse discretionary determination. And, in fact, the field manual recognizes that and creates other exceptions because of it. Correct. They don't have to arrive at a designated port of entry, even though that's a ground of inadmissibility. Well, definitely. I mean, that's just one more acknowledgment of U.S. policy, the Department of Homeland Security's and former legacy INS's policy toward Cuban immigrants. Cuban immigrants can enter without inspection and be inadmissible, therefore. But under these policies, all they need to do is surrender to the government and they are paroled in the public interest for humanitarian reasons. And a year and a day later, they can apply for adjustment of status. Are there any reported decisions in courts, in this Court or any other? I know there's not in this Court, about waivers with regard to the statute. No, Your Honor. To my knowledge, this is a case of first impression with respect to the Cuban Adjustment Act. I have not – I'm not aware of any others with respect to any other remedial legislation. But many of the – I mean, the strongest counterargument to your claim is that many of the other acts do have waivers, and of this provision itself. Well, the Refugee Act of 1980 revamped refugee law. And it was, I think, then that the waivers were inserted into what we know today as the refugee laws, the asylum laws. But clearly, that was an attempt by Congress to sort of come up with a more uniform way of addressing refugee problems around the world. So you would say that that's a broader act, whereas the Cuban Adjustment Act is a more specific act? It's a specific act. And prior to that time, refugee acts or laws that addressed refugees were more reactionary or responding to crises around the world. The Cuban crisis is one of them. It was all a part of allowing refugees to resettle. So these people were coming in massive numbers between 1959 and 65, and they were coming in and the government was paroling them under the parole authority. They were allowed to work. But some of these people were professionals, and unless they acquired lawful permanent resident status, they were stifled. And so finally, they implemented this Cuban Adjustment Act to give these refugees resident status and hopefully someday citizenship. It opened the door to U.S. citizenship for these refugees. Let me ask you, I'm trying to think about how we would dispose of the case. Let's just assume for the sake of discussion that we think you've got a loser on the credibility issue, and on the firm resettlement, you've got a loser because it wasn't properly exhausted. But we think you've got a point on the Cuban Adjustment Act. What relief would we grant? How would the case proceed? Well, the court could issue an opinion agreeing that... That says that he is eligible for a humanitarian, eligible for consideration for a humanitarian waiver. Yes. The court could hold that the Cuban Adjustment Act applies to refugees, that refugees, therefore, are eligible under, given the legislative history of the Cuban Adjustment Act, that Cubans who are identified in the class of protected people under the Cuban Adjustment Act can avail themselves of a refugee waiver. If the court issues an opinion like that, the court can remand to the BIA to determine if the petitioner warrants a favorable exercise of discretion by the Attorney General. And the waiver was already filed before the immigration judge, so the waiver's in the file. I guess there are two other options. One would be to simply remand to the BIA and say, explain this to us. You know, you have, you create exceptions for some purposes and not for others, and you haven't told us anything about this. And if that were the case, Your Honor, I would really request an opportunity from the BIA to brief the issue more thoroughly than it's been briefed up until now. And the second possibility, which I'd like your opinion on, is to send this case to our mediators and to see whether, in light of the fact that there's that open question, and also in light of the fact, as I understand it, we don't deport people to Cuba anyway. There's no repatriation agreement. Can he go to Mexico? I'm sorry? Can he go to Mexico? No, he has no right. His mother, by the way, Your Honor, not to recite facts that are not in the record, but his mother, who he lived with in Mexico, is now in the U.S. and is now a lawful permanent resident. Unfortunately, we can't do a normal waiver because there is no waiver under the ordinary admissibility rules for a false claim to citizenship. Mexican visa's expired? It's expired, and he has no right to one. He was a child, I believe, when he came to live in Mexico. So what I'm asking you is, would there be any point, in light of these peculiar facts, to seeing, and I'd obviously have to ask the government this, to seeing whether you could resolve this question with the help of the court mediators? Well, that- Which wouldn't result in an opinion on the issue, but it might resolve your client's issue. Well, Your Honor, obviously, we would strongly prefer a positive opinion from the court on the issue of the refugee waiver vis-a-vis the Cuban Adjustment Act. However, obviously, we always like the possibility of settling with the government and sending the case back. Certainly, I would be amenable to briefing the issue with the BIA, but obviously, our number one priority is to get a decision, a favorable decision. Well, his number one priority may be to stay in the United States. Your number one priority might be an opinion, but- Absolutely. And, you know, but we don't just want to be a Cuban refugee who has a deportation order, who's in some sort of limbo, who can't be deported because his country won't take him back. We want to accomplish lawful permanent resident status. We want to accomplish citizenship. That's what we want to accomplish. Thank you very much, Mr. Posada. Thank you, Your Honor. Thank you. Good morning, Your Honor. My name is Edward Duffey, and I represent the Respondent, the Attorney General. In this matter, as the Court's aware, and from the argument, the administrative record in this case is incomplete, and we are attempting to resolve that issue, and we'll proceed to do that. However, in light of Mr. Perez's failure to exhaust his remedy as far as permanent settlement is concerned, and the fact that the Cuban Adjustment Act issue, we believe he's not eligible under the Cuban Adjustment Act, and the immigration judge's decision on that was correct. And that, I mean, this is the situation as I see it. Yes, if you look at the Cuban Adjustment Act on its face, he's not eligible. But, A, there are other possible statutory provisions. But more than that, that statute has not been applied literally by the agency. The agency has in its field manual a set of exceptions that as a policy it doesn't apply precisely because it realizes that people come to this country irregularly, and that's why it doesn't apply.  apply to the Cuban Adjustment Act, and that's why it doesn't apply to the Cuban Adjustment Act. We have no explanation from the BIA as to why this particular inadmissibility problem, which is sort of of the same character as the other ones which are not being applied, is being applied. Nobody has told us anything about where you're drawing a line, why you're drawing a line, and why this is on one side of the line rather than the other one. That's correct, Your Honor. I think if you look at the immigration judge's decision, the immigration judge did explain why he drew the line where he drew it. What did he say? Well, he looked at the other statute from the Cuban Adjustment Act. I understand that, and that's not an ineffective argument. But what he didn't look at is the fact that there are four or five, as I counted them up, bases for inadmissibility that are not applied to Cuban refugees. That's correct, Your Honor. In this case, you had a basis of inadmissibility of fraud that has been ---- Well, first of all ---- Again, we don't have the Board's decision as to why ---- But the agency's policy is not to apply the ground of not coming to a regular point of entry. Lettering without the statute. I think that's one of them, but I think there's a second one as well. In any event, they don't apply that. That's correct, Your Honor. As a matter of practice, they haven't used that basis of inadmissibility to deny adjustment in the Cuban Adjustment Act. All right. And that is within the discretion of the agency as to whether or not they will apply all bases. And in this case, the immigration judge chose not to apply the ---- But usually you have rules and law, and you have some basis for knowing what applies and what doesn't. You just make it up as you go along, and that's sort of ---- So we need some story about why this is more like A than like B. Your Honor, had the Board been faced with an argument that was ---- Mr. Posada presented it very well in his brief. Had the Board been faced with that same argument, I'm sure they would not have affirmed this without an opinion and streamlined it. And part of the problem, as the Court recognizes, is that his brief, his notice of appeal, while he did mention the Cuban Adjustment Act, and did say that the immigration judge erred, finding that he wasn't eligible for it, he did not suggest any waivers that he might be eligible for. He did not suggest that the action, that waiver of inadmissibility shouldn't be applied to him. Excuse me, that grounds of inadmissibility shouldn't have been applied. It just laid out an allegation of error. But he did adequately exhaust. I mean, he raised the issue to the Board, and the Board necessarily had to decide it. And then we're now faced with a situation where we have no grounding. We have no theory from the agency on some key questions, like why doesn't the humanitarian standards apply? Why isn't this a subset of refugee law? Why, given all these other exceptions, isn't there one for this? We just don't know. It's not a subset of refugee law. This is on the law, it does have humanitarian purpose, and it does serve that purpose. It's under adjustment of status. It's under adjustment of status for a reason, in that it enables people to streamline and to forego some of the other eligibility requirements for adjustment of status for humanitarian purposes. It is not under, as we point out in our brief, it is not under any of the refugee acts. And, in fact, he did apply for asylum. He did apply for withholding removal on protection under Convention Against Torture, and was eligible for those, and any possible waivers that could go with those particular statutes. However, Congress, when it instituted the Cuban Adjustment Act, and when it instituted Nicara as another good example, Nicara does contain waivers. And it's in the same, it's under the same statute. It's under 245, just like the Cuban Adjustment Act is. And when Congress wants waivers to apply, Congress has shown that it will include that in the legislation itself. When was Nicara enacted? Nicara was enacted in, I'm not sure, it was well post the CAA. I'm believing, I want to say 96, but I may be off on that, Your Honor. I can give you that answer if you'd like. Was the CAA the first of this series of statutes? I don't know that it was the first, but it was certainly an early one, Your Honor. I believe there were some that went to Palestinians prior to that, and others. But the CAA was certainly in 1959. But did those have waivers in the statute at the earlier junctures? I'm not familiar with whether or not they had waivers or not. What's your reaction to the mediation option, given the following? A, the problem with the record. B, these problems we have with at least not being informed about what the reasoning is. And C, the fact that he's not going back to Cuba anyway. Your Honor, I am a frequent user of your mediation program when I see a problem with the case. And in this case, I would not object to it being sent to mediation if that was in the best interest of deciding this case, because I don't think the Court, based on the record as raised below, I don't think the Court has enough to work with on the credibility issue at all, because we don't know what's in the missing exhibits. Now, I can bore you with how these mistakes happen. This is one of those cases that had come up on a petition review. Petition review had been denied, so the administrative record thing gets sent away. So when it came back for the reinstatement of the order of removal, human error clearly happened in this case, and the record was not assembled properly. And it's something that, frankly, we should have caught at the time. But the as far as mediation is concerned, I'm always a member of the mediation. And I think this is one, based on the state of the record, that we could possibly come to a resolution on. I don't think, unless the DHS or BIA is involved, that they will acquiesce in the Cuban Adjustment Act issue necessarily. I mean, that's a – for them, that would be an executive decision as to how the statute applies and what waivers – not necessarily what waivers apply, because that would be statutory, but what type of discretion they exercise. But I assume that when you, as the Attorney General, engage in mediation, you talk to your clients. Excuse me, Your Honor? You talk to your clients. I talk to my clients almost every day. There's always been a little confusion when I've talked to people from your office about who is your client, whether it's the BIA or DHS. That's an open question at times, Your Honor. We defend the decisions of the BIA, and I am not in a position to say – we advise DHS at times. We certainly don't advise the BIA, because the BIA is an independent decision-making body that is adjudicating cases, and they are free to accept or reject any recommendations that we may make. But we do defend their position, their decisions. So to the effect that we're defending them in court, they are our client. I had always thought, frankly, that it was DHS. But then at some other points when I've talked to people, they seem to think that it's actually the BIA or the Attorney General, because that's who you're defending. Well, the Attorney General – since BIA acts for the Attorney General, the Attorney General is certainly a client, so it's sort of an intramural representation. But in any event, they all should be somewhat interested in this Human Adjustment Act problem, it would seem to me. It's an interesting problem. Well, and as to how the statute is enforced, Your Honor, and whether they wish to consider that, that's an open question, and not one that certainly the Board did not address in this issue, because I don't believe, as we say in our brief, it was properly raised to the Board, it was adequately briefed to the Board. It's just a matter of whether he was eligible for the Human Adjustment Act, and clearly by the plain terms of the statute, he was not eligible for relief under that statute. I, for one, appreciate both your candor and your willingness to explore mediation. I'm wondering if we did send it, how much time do you think we should allow to see if it works out? 120 days, 90 days? I was going to say 90 to 120 days would be enough to explore, because we're aware of the record issue, and whether or not that will be resolved is another issue, but also the CAA question is one that I think that DHS may want to weigh in on, along with the Attorney General. Excuse me for that. Mr. Posada, does that sound right to you? Yes, Your Honor. 180 days? I think he said... 120. 90 to 120. Well, you can ask for extensions at that point. Yeah, sure. Anything else we need to explore on this? Your Honor, I rest on my brief and what I previously said in argument at this point. Okay. Judge Menendez, Judge Breslin, anything? No. No, that's fine. Mr. Posada, thank you very much. The case just argued is submitted. Don't be surprised if we send an order revoking the submission, withholding the submission and sending it to mediation. We'll try to attend to that promptly. Thanks again, Mr. Duffy. Mr. Posada, thank you, too. The last case for today is 0617228 Bustamante v. Mukasey. Each side has 20 minutes.
judges: Silverman, Berzon, Benitez